**PROTECTED INFORMATION REDACTED**

[ORAL ARGUMENT NOT YET SCHEDULED]

No. 14-5116

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

AHMED ADNAN AJAM,

*Petitioner-Appellant,*

v.

RICHARD BUTLER, ET AL.,

*Respondents-Appellees.*

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA

**BRIEF OF PETITIONER-APPELLANT**

Sabin Willett (Bar No. 50134)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

David S. Marshall
 *Counsel of Record*
1001 Fourth Avenue, 44th Floor
Seattle, WA 98154-1192
Telephone: (206) 826-1400
Facsimile: (206) 389-1708
dmarshall@DavidSMarshall.com

 *Counsel for Appellant*

July 8, 2014

**PROTECTED INFORMATION REDACTED**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

**(A)   Parties and *Amici***

The only parties, intervenors, and amici appearing before the district court and this Court in this action are Petitioner-Appellant Ahmed Adnan Ajam and Respondents-Appellees President Barack Obama, Secretary of Defense Chuck Hagel, Rear Admiral Richard Butler, and Colonel John Bogdan, and the Respondents' predecessors in office.

**(B)   Rulings Under Review**

The ruling at issue in this appeal is the district court's entry, pursuant to Fed. R. Civ. P. 54(b), of final judgment dismissing Count II of the Amended Habeas Petition in *Ajam v. Obama*, No. 09-745 (D.D.C. Apr. 24, 2014), pursuant to its ruling denying Appellant's motion for partial summary judgment, issued March 21, 2014.  Copies of the district court's decisions can be found in the Joint Appendix at pages 46-58 and 66.

**(C)   Related Cases**

There are no related cases.

/s/   *David S. Marshall*

David S. Marshall

*i*

**PROTECTED INFORMATION REDACTED**

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ... i

TABLE OF CONTENTS................................................................ii

TABLE OF AUTHORITIES........................................................iv

GLOSSARY...............................................................................xii

PRELIMINARY STATEMENT ................................................ 1

JURISDICTION ......................................................................... 2

STATEMENT OF ISSUES ........................................................ 3

RELEVANT PROVISIONS OF LAW ....................................... 3

STATEMENT OF THE CASE .................................................... 7

    A.  Underlying Facts .............................................................. 7

    B.  Ajam's Original Detention and Summary of Habeas History ............. 8

    C.  Undisputed Facts Related to Negotiations for Transfer ...................... 9

    D.  Enactment of NDAA Limitations....................................... 10

    E.  Presidential Acknowledgement of Section 1035's Unconstitutional Interference with Exercise of Executive Authority................................... 12

    F.  Impact of NDAA ............................................................. 14

STANDARD OF REVIEW ....................................................... 16

SUMMARY OF ARGUMENT .................................................. 16

PROTECTED INFORMATION REDACTED

ARGUMENT ........................................................................ 18

1.   The Law-of-War Context of the Standing Dispute......................... 19

3.   Appellant Meets the Standing Test................................ 23

a.   Ajam suffers and has suffered Concrete, Actual Injury. ............ 24

b.   Appellant's Injuries Have Been Directly Traceable to the Requirements of the NDAA. ...................................... 27

c.   A Declaration that Section 1035 is Void Would Redress Appellant's Injuries. ........................................... 29

b.   The Court Should Presume Ajam has Standing Because He is the Object of Government Action. ................................. 32

1.   This Court Should Review Appellant's Constitutional Challenge. 33

2.   The President's Exclusive Commander-in-Chief Power Precludes Congress From Interfering with Targeting Decisions Within the Scope of Authorized Armed Conflict. ............................... 33

3.   The President's Power Under the Foreign Affairs Clause Precludes Congress' Interference with Executive Agreements and Sensitive Diplomatic Negotiations. ........................................ 38

CONCLUSION...................................................................... 44

**PROTECTED INFORMATION REDACTED**

## TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)................................................................ 24

*Ahjam v. Obama,*
    No. 09-cv-745 (D.D.C. 2009) (RCL) ..................................... 8, 9

*Ali v. Obama,*
    736 F. 3d 542 (D.C. Cir. 2013)........................................ 17, 41

*Already, LLC v. Nike, Inc.,*
    133 S. Ct. 721 (2013)........................................................... 21

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) ............................................................. 38

*Am. Petroleum Inst. v. Johnson,*
    541 F. Supp. 2d 165 (D.D.C. 2008)...................................... 31

*Ameziane v. Obama,*
    No. 05-cv-392 (D.D.C. Aug. 8, 2013)................................... 15

*Arizona Christian Sch. Tuition Org. v. Winn,*
    131 S. Ct. 1436 (2011)......................................................... 21

*\*Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)........................................................ 29, 30

*Baker v. Carr,*
    369 U.S. 186 (1962)............................................................. 24

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

**PROTECTED INFORMATION REDACTED**

*Bond v. United States,*
    131 S. Ct. 2355 (2011).................................................................. 21

*\*Boumediene v. Bush,*
    553 U.S. 723 (2008)................................................. 19, 22, 25, 26, 32, 33

*Brownell v. Tom We Shung,*
    352 U. S. 180, 352 U. S. 183 (1956) ........................................ 31

*Camreta v. Greene,*
    131 S. Ct. 2020 (2011).................................................................. 21

*\*Clapper v. Amnesty Int'l,*
    133 S. Ct. 1138 (2013).................................................... 18, 21, 23

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)................................................................... 21

*Davis v. Fed. Election Comm'n,*
    554 U.S. 724 (2008)................................................................... 21

*Dep't of the Navy v. Egan,*
    484 U.S. 518 (1988)................................................................... 37

*Disability Rights Council of Greater Washington v. Washington
    Metro. Area Transit Auth.,*
    239 F.R.D. 9 (D.D.C. 2006) .................................................... 22

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,*
    438 U.S. 59 (1978)................................................................ 28, 29

*Earth Island Inst. v. Christopher,*
    6 F.3d 648 (9th Cir. 1993) ...................................................... 37

*Fleming v. Page,*
    50 U.S. (9 How.) 603 (1850) ................................................... 33

*Foretich v. United States,*
    351 F.3d 1198 (D.C. Cir. 2003)................................................ 41

PROTECTED INFORMATION REDACTED

*Frank v. Mangum,*
    237 U.S. 309 (1915)................................................................ 30

*Fund for Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003)............................................. 31

*Gratz v. Bollinger,*
    539 U.S. 244 (2003)............................................................. 24

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006)............................................................. 33

*\*Hamdi v. Rumsfeld,*
    542 U.S. 507 (2004)...................................................... 18, 33

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)............................................................. 37

*Hein v. Freedom From Religion Found., Inc.,*
    551 U.S. 587 (2007)............................................................. 21

*Hensley v. Municipal Court,*
    411 U. S. 345 .................................................................... 30

*Horne v. Flores,*
    557 U.S. 433 (2009)............................................................. 21

*INS v. Chadha,*
    462 U.S. 919 (1983)...................................................... 25, 26

*Jones v. Cunningham,*
    371 U. S. 236 (1963)........................................................... 30

*Judicial Watch, Inc. v. United States Senate,*
    432 F. 3d 359 (D.C. Cir. 2005) (Williams, J., concurring) .................... 20

*Kiyemba v. Obama,*
    561 F.3d 509 (D.C. Cir. 2009)...................................... 25, 40

*Kiyemba v. Obama (Kiyemba III),*
    605 F.3d 1046 (D.C. Cir. 2010)........................................... 43

**PROTECTED INFORMATION REDACTED**

*United States ex rel. Knauff v. Shaughnessy,*
    338 U. S. 537 (1950)...................................................................... 31

*Lance v. Coffman,*
    549 U.S. 437 (2007)...................................................................... 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014).................................................................. 21

*Ludecke v. Watkins,*
    335 U.S. 160 (1948)...................................................................... 38

*\*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992), and (ii)...................................... 20, 21, 22

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007)...................................................................... 21

*McMullen v. United States,*
    953 F.2d 761 (2d Cir. 1992) ........................................................ 42

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007)...................................................................... 21

*Ex parte Milligan,*
    71 U.S. (4 Wall.) 2 (1866) .......................................................... 33

*Mohammon v. Bush,*
    No. 05-2386 (D.D.C. 2005) (RBW) ..............................................8

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)...................................................................... 38

*Northeast Fla. Chapter, Associated Gen. Contractors of Am. v.*
    *Jacksonville,*
    508 U.S. 656 (1993)...................................................................... 24

*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007)...................................................... 21

**PROTECTED INFORMATION REDACTED**

*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
    554 U.S. 316 (2008)................................................................ 21

*Preiser v. Rodriguez*,
    411 U.S. 475 (1973)................................................................ 30

*Settles v. U.S. Parole Comm'n*,
    429 F.3d 1098 (D.C. Cir. 2005)........................................ 23, 24

*Shaughnessy v. United States ex rel. Mezei*,
    345 U. S. 206 (1953).............................................................. 31

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008)................................................................ 21

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)......................................................... 18, 21

*\*Susan B. Anthony List v. Driehaus*,
    No. 13–193, 2014 WL 2675871 (U.S. June 16, 2014)............... 17, 21, 23

*\*Tozzi v. U.S. Dep't of Health & Human Servs.*,
    271 F.3d 301 (D.C. Cir. 2001)...................................... 26, 28, 29

*United States v. Belmont*,
    301 U.S. 324 (1937)................................................................ 38

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936)......................................................... 37, 40

*United States v. Jung Ah Lung*,
    124 U. S. 621, 124 U. S. 626 (1888) ..................................... 31

*United States v. Lopez*,
    650 F.3d 952 (3d Cir. 2011) ............................................... 24

*United States v. Lovett*,
    328 U.S. 303 (1946)................................................................ 41

*United States v. Salahmand*,
    651 F.3d 21 (D.C. Cir. 2011).................................................. 16

**PROTECTED INFORMATION REDACTED**

*United States v. Windsor,*
    133 S. Ct. 2675 (2013) .................................................................. 21

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................... 18

*The Wilderness Soc'y v. Kane Cnty., Utah,*
    581 F.3d 1198 (10th Cir. 2009), *on reh'g en banc sub nom.*
    *The Wilderness Soc. v. Kane Cnty., Utah,* 632 F.3d 1162
    (10th Cir. 2011) ........................................................................... 21

*\*Zivotofsky ex rel. Zivotofsky v. Sec'y of State,*
    725 F.3d 197 (D.C. Cir. 2013) ............................................. 38, 39, 40

**Statutes and Constitutional Provisions**

28 U.S.C. § 2202 ..............................................................................3

28 U.S.C. § 1291 ..............................................................................2

28 U.S.C. § 2201(a) ..........................................................................3

2011 National Defense Authorization Act, Pub. L. 111-383,
    124 Stat. 4137 (Jan. 7, 2011) ..................................................... 1, 8

*2014 National Defense Authorization Act, Pub. L. 113–66,
    127 Stat. 672 (Dec. 26, 2013)
    .........3, 4, 10, 12, 17, 23, 25, 26, 27, 28, 29, 32, 35, 36, 39, 40, 41, 42, 43

Authorization for the Use of Military Force, Pub. L. No. 107-
    40, 115 Stat. 224 (Sept. 18, 2001) .......................................... 7, 33, 37

Fed. R. Civ. P. 54(b) ...................................................................... 2, 8

Supplemental Appropriations Act for Fiscal Year 2009, Pub. L.
    No. 111-32, § 14103(d), 123 Stat. 1859 (June 24, 2009) ................... 1, 10

U.S. Const. art. I, § 8 ................................................................... 18, 32

U.S. Const. art. I, § 8, cl. 14. ............................................................ 34

PROTECTED INFORMATION REDACTED

*U.S. Const. art. II, § 2 .......................................................... 3, 17, 19, 32, 35

**Other Authorities**

Cong. Research Serv., *Prisoners of War: Repatriation or
   Internment in Wartime - American and Allied Experience* ..................... 15

David J. Barron & Martin S. Lederman, *The Commander In
   Chief at the Lowest Ebb—Framing the Problem, Doctrine,
   and Original Understanding*, 121 HARV. L. REV. 689, 800
   (2008)...................................................................................... 34

Executive Order No. 13567 ....................................................... 4, 5

Guantanamo Bay. *The Guantanamo Docket*, N.Y. Times,
   http://projects.nytimes.com/guantanamo/timeline (last
   visited June 18, 2014) ........................................................... 14

*Guantanamo*, FoxNews.com (June 7, 2014),
   http://www.foxnews.com/politics/2014/06/07/lawmakers-
   obama-releasing-taliban-detainees-with-no-notice-first-step-
   in/ ........................................................................................ 16, 42

Harvard Law Review, *Recent Legislation*, 127 Harv. L. Rev.
   835, 838 (2013)...................................................................... 34

James M. McPherson, BATTLE CRY OF FREEDOM 791 (1988) .................... 15

James P. Sterba, *First Prisoner Release Completed*, N. Y.
   Times, Feb. 13, 1972 ............................................................... 15

Kurt Eichenwald, *The Truth Behind the Bowe Bergdahl POW
   Prisoner Swap*, Newsweek, June 3, 2014................................... 15

*Long Tradition, DOD Counsel Says*, American Forces Press
   Service (June 11, 2014), *available at*
   http://www.defense.gov/news/newsarticle.aspx?id=122456 ................. 15

PROTECTED INFORMATION REDACTED

Major Gary D. Brown, PRISONER OF WAR PAROLE: ANCIENT
CONCEPT, MODERN UTILITY, 156 Mil. L. Rev. 200, 214
(June, 1998) ...................................................................... 15

Statement by the President on H.R. 1540 (Dec. 31, 2011),
*available at* http://www.whitehouse.gov/the-press-
office/2011/12/31/statement-president-hr-1540 .................................... 13

Statement by the President on H.R. 3304 (Dec. 26, 2014),
*available at* http://www.whitehouse.gov/the-press-
office/2013/12/26/statement-president-hr-3304 .................................... 12

Statement by the Press Secretary on Guantanamo Bay (July 26,
2013), *available at* http://www.whitehouse.gov/the-press-
office/2013/07/26/statement-press-secretary-guantanamo-
bay ...................................................................................... 14

Statement by the the President on H.R. 4310 (Jan. 3, 2013),
*available at* http://www.whitehouse.gov/the-press-
office/2013/01/03/statement-president-hr-4310 ......................... 13, 39, 40

Statement on the Transfer of Detainees before the House
Armed Services Committee, Secretary of Defense Chuck
Hagel, *available at*
http://www.defense.gov/speeches/speech.aspx?speechid=18
60 ...................................................................................... 15, 16

PROTECTED INFORMATION REDACTED

## GLOSSARY

*NDAA*       National Defense Authorization Act.  NDAA is a generic reference to bills enacted on an annual basis.  The text specifies different annual versions as the same are relevant.

*AUMF*       Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001).

PROTECTED INFORMATION REDACTED

## PRELIMINARY STATEMENT

In 2005, Appellant Ahmed Adnan Ajam[2], a prisoner at the Guantanamo Bay military prison, petitioned for a writ of *habeas corpus*. He alleged that because he is not an enemy belligerent, his imprisonment is illegal. The President contended that Ajam is properly detainable under the laws of war. This dispute became moot when the President determined, in the exercise of his discretion as Commander-in-Chief, that any military necessity for Ajam's continued detention had passed, and that Ajam, who poses no threat to U.S. security, should be transferred to a third nation. ▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉

In 2013, Ajam amended his *habeas* writ, adding a prayer for declaratory relief, which seeks a declaration that NDAA provisions imposing upon the President prerequisites to Ajam's release or transfer from

---

[2]  Appellant's name on lower court dockets has sometimes been transliterated as "Ahjam." Ajam is correct.

[3]  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉  ▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉

[4]  Congress authorizes funds for the Department of Defense in an annual appropriations bill ("NDAA"). For the first time in 2009, *see* Supplemental Appropriations Act for Fiscal Year 2009, Pub. L. No. 111-32, § 14103(d), 123 Stat. 1859 (June 24, 2009), Congress added to the bill provisions limiting the President's ability to cease using military force against detainees at Guantanamo. It has done so each year thereafter. Appellant refers to these bills by date; for example, as the "2014 NDAA."

**PROTECTED INFORMATION REDACTED**

Guantanamo are unconstitutional. Because Ajam's detention was a use of military force against a discrete target, *suspension* of that force against that particular target is a power fundamental to the Constitutional authority of the Commander-in-Chief, and cannot, under Article II of the Constitution, be obstructed by Congress. The 2014 NDAA[5] (and each prior iteration) has unconstitutionally obstructed that power. The same restrictions also constitute an unconstitutional bill of attainder.

By impeding Ajam's release process, ████████████████████ ████████████████████████████████████████ ██████████████ The Court should direct the district court to issue a declaration that the law is void as unconstitutional.

## JURISDICTION

Appellant's notice of appeal to this Court was filed and docketed on May 20, 2014. Ajam appeals from a final judgment dismissing his claim for declaratory judgment pursuant to Fed. R. Civ. P. 54(b), which was entered by the district court on April 24, 2014. *See* J.A. 66. This judgment followed the district court's March 21, 2014 denial of Ajam's motion for partial summary judgment. *See* Memorandum Opinion, J.A. 46-58. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

---

[5]    Initially, relief was sought against provisions of the 2013 NDAA. Delays in the litigation led the parties and district court to address the 2014 NDAA in the decision on appeal.

PROTECTED INFORMATION REDACTED

## STATEMENT OF ISSUES

I.      Whether the district court erred in concluding that Appellant lacks standing to challenge the constitutionality of Section 1035 of the 2014 NDAA.

II.     Whether Congress's obstruction, via the 2014 NDAA and previous versions thereof, of the Commander-in-Chief's decision to cease targeting Ajam with military force, is unconstitutional.

III.    Whether the NDAA is not an unconstitutional bill of attainder.

## RELEVANT PROVISIONS OF LAW

The following provisions of constitutional, statutory, and international law are relevant to this appeal.

U.S. Const. art. II, § 2 provides:

The President Shall be Commander in Chief of the Army and Navy of the United States.

28 U.S.C. § 2201(a) provides:

…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C.A. § 2202 provides:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

**PROTECTED INFORMATION REDACTED**

Section 1035 of the National Defense Authorization Act for Fiscal Year 2014 provides, in pertinent part:

(a) Authority to Transfer Under Certain Circumstances. — The Secretary of Defense is authorized to transfer or release any individual detained at Guantanamo to the individual's country of origin, or any other foreign country, if—

(1) the Secretary determines, following a review conducted in accordance with the requirements of section 1023 of the National Defense Authorization Act for Fiscal Year 2012 (10 U.S.C. 801 note and Executive Order No. 13567, that the individual is no longer a threat to the national security of the United States; or

(2) such transfer or release outside the United States is to effectuate an order affecting disposition of the individual by a court or competent tribunal of the United States having jurisdiction.

(b) Determination Required Prior to Transfer. — Except as provided in subsection (a), the Secretary of Defense may transfer an individual detained at Guantanamo to the custody or control of the individual's country origin, or any other foreign country, only if the Secretary determines that—

(1) actions that have been or are planned to be taken will substantially mitigate the risk of such individual engaging or reengaging in any terrorist or other hostile activity that threatens the United States or United States persons or interests; and

(2) the transfer is in the national security interest of the United States

(c) Factors to be Considered in Making Determination. — In making the determination specified in subsection (b), the Secretary of Defense shall specifically evaluate and take into consideration the following factors:

PROTECTED INFORMATION REDACTED

(1) The recommendations of the Guantanamo Detainee Review Task Force established pursuant to Executive Order No. 13492 and the recommendations of the Periodic Review Boards established pursuant to No. Executive Order 13567, as applicable.

(2) The security situation in the foreign country to which the individual is to be transferred, including whether or not the country is a state sponsor of terrorism, the presence of foreign terrorist groups, and the threat posed by such groups to the United States.

(3) Any confirmed case in which an individual transferred to the foreign country to which the individual is to be transferred subsequently engaged in terrorist or other hostile activity that threatened the United States or United States persons or interests.

(4) Any actions taken by the United States or the foreign country to which the individual is to be transferred, or change in circumstances in such country, that reduce the risk of reengagement of the type described in paragraph (3).

(5) Any assurances provided by the government of the foreign country to which the individual is to be transferred, including that—

    (A) such government maintains control over any facility at which the individual is to be detained if the individual is to be housed in a government-controlled facility; and

    (B) such government has taken or agreed to take actions to substantially mitigate the risk of the individual engaging or reengaging in any terrorist or other hostile activity that threatens the United States or United States persons or interests.

(6) An assessment of the capacity, willingness, and past

**PROTECTED INFORMATION REDACTED**

practices (if applicable) of the foreign country described in paragraph (5) in meeting any assurances it has provided, including assurances under paragraph (5) regarding its capacity and willingness to mitigate the risk of reengagement.

(7) Any record of cooperation by the individual to be transferred with United States intelligence and law enforcement authorities, pursuant to a pre-trial agreement, while in the custody of or under the effective control of the Department of Defense, and any agreements and effective mechanisms that may be in place, to the extent relevant and necessary, to provide continued cooperation with United States intelligence and law enforcement authorities.

(8) In the case of an individual who has been tried in a court or competent tribunal of the United States having jurisdiction on charges based on the same conduct that serves as a basis for the determination that the individual is an enemy combatant, whether or not the individual has been acquitted of such charges or has been convicted and has completed serving the sentence pursuant to the conviction.

(d) Notification.—The Secretary of Defense shall notify the appropriate committees of Congress of a determination of the Secretary under subsection (a) or (b) not later than 30 days before the transfer or release of the individual under such subsection. Each notification shall include, at a minimum, the following:

(1) A detailed statement of the basis for the transfer or release.

(2) An explanation of why the transfer or release is in the national security interests of the United States.

(3) A description of any actions taken to mitigate the risks of reengagement by the individual to be transferred or released, including any actions taken to address factors relevant to a prior case of reengagement described in subsection (c)(3).

PROTECTED INFORMATION REDACTED

(4) A copy of any Periodic Review Board findings relating to the individual.

(5) A description of the evaluation conducted pursuant to subsection (c), including a summary of the assessment required by paragraph (6) of such subsection.

## STATEMENT OF THE CASE

**A.    Underlying Facts**

Petitioner has been detained for twelve years at the Guantanamo Bay Naval Station. J.A. 25-26 (Statement of Undisputed Material Facts) at ¶¶ 1, 4. The government's only justification for detention was the Commander-in-Chief's assertion that Ajam was targetable with military force, in the form of detention, as an enemy belligerent. J.A. 26 (Statement at ¶ 5). Ajam has always disputed that claim. *Id.*

While Ajam denies that he was ever an enemy belligerent, the dispute became academic when the President, exercising the same Constitutional authority by which he alleges that his predecessor originally selected Ajam from among authorized targets,[6] determined to desist from targeting Ajam, and pursuant to his powers as Commander-in-Chief and over foreign affairs, to transfer Ajam to another country. J.A. 31-32 (Declaration of David S. Marshall ("Marshall Decl.") at ¶ 3). ■ ▬▬▬ ▬▬ ▬▬

---

[6] The President has correctly disavowed any constitutional power independent of the Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001) ("AUMF") to seize and detain persons as enemy belligerents. The AUMF, however, authorized him to detain members of the military force of the enemy named by Congress for the duration of active hostilities.

7

**PROTECTED INFORMATION REDACTED**

████████████████████████████████████████████

████████████████████████████████ Congress enacted the 2011 NDAA, Publ. L. No. 111-383, 124 Stat. 4137 (Jan. 7, 2011), imposing restrictions upon the transfer. In 2012, 2013, and 2014, Congress annually enacted versions of the NDAA, including provisions that obstructed the Commander-in-Chief's exercise of his sole discretion to desist from targeting Ajam by transferring him to the territory of another sovereign. These enactments had the direct—and intended—result of forcing the President to continue targeting prisoners like Ajam by continuing to imprison him at Guantanamo. *See* discussion, *infra* pp. 14-16.

**B.    Ajam's Original Detention and Summary of Habeas History**

Detained in 2002, Ajam was one of many prisoners upon whose behalf, in 2005, a joint petition for a writ of habeas corpus was filed in the action styled *Mohammon v. Bush*, No. 05-2386 (D.D.C. 2005) (RBW). His case was reassigned several times, and in April, 2009, docketed as *Ahjam v. Obama*, No. 09-cv-745 (D.D.C. 2009) (RCL). In 2010, the district court issued an order staying the proceedings as to Ajam to avoid litigation during negotiations related to his transfer. Memorandum and Order, filed under seal, *Ahjam v. Obama*, No. 09-cv-745 (D.D.C. Mar. 30, 2010) (RCL). Since then, however, Ajam's transfer has failed to come to pass.

On July 19, 2013, the district court allowed Ajam to amend the petition for *habeas corpus,* adding a claim for a declaration that the NDAA is void. See J.A. 13. Ajam's motion for partial summary judgment followed, and was denied by the District Court on March 20, 2014. J.A. 46-58. Pursuant to Fed. R. Civ. P. 54(b), the district court entered final

PROTECTED INFORMATION REDACTED

judgment dismissing the prayer for declaratory relief on April 24, 2014.  J.A. 66.

**C.     Undisputed Facts Related to Negotiations for Transfer**

In November 2009, Ajam's counsel learned that the President's Guantanamo Review Task Force had cleared Ajam for transfer.  J.A. 31-32 (Marshall Decl. at ¶ 3).  This decision "was reached by the unanimous agreement of the agencies responsible for the review: the Department of Justice, Department of Defense, Department of State, Department of Homeland Security, Office of the Director of National Intelligence, and Joint Chiefs of Staff."  Guantanamo Review Task Force, Final Report, at page i (2010) ("Final Report").  The Task Force's guidelines allowed it to limit a particular detainee's transfer "to specified countries or under specified conditions." *Id*. at 7.



PROTECTED INFORMATION REDACTED

**D.    Enactment of NDAA Limitations**

In 2009 the Commander-in-Chief sought to desist from targeting certain Uighur prisoners who had been held for many years at Guantanamo Bay, although the government had long recognized they were not enemy belligerents.    Congress's hasty response inaugurated five years of interference with Executive decisions to cease targeting Guantanamo prisoners.[7]  Most recently, on December 26, 2013, Congress enacted the 2014 NDAA, which is effective today.

Section 1035 of the 2014 NDAA applies uniquely to the small number of aliens still held at Guantanamo, prohibiting their transfer unless the President submits to terms set out by Congress.  It defines the only means by which Congress will permit Ajam's release.  The Secretary of Defense must undertake a "specific review" (following technical requirements set out in Section 1023 of the 2012 NDAA).  Instead of leaving to the commander what to consider before he stops targeting Ajam, Congress lays out precisely what "determinations" the Secretary must make.  He must "determine" that in the transferee nation, "actions . . . have been or planned to be taken [that]

---

[7]    The Supplemental Appropriations Act of 2009, Pub. L. No. 111-32, 123 Stat. 1859 (June 24, 2009), was rushed into law soon after it became public that the President planned to release certain Uighurs in the United States.   Later versions of the NDAA went far beyond U.S. transfers, purporting to bar the use of funds to effectuate the transfer of a Guantanamo detainee to a foreign country absent compliance with Congress's conditions.

**PROTECTED INFORMATION REDACTED**

will substantially mitigate the risk of such individual engaging in any . . . hostile activity that threatens the United States or United States persons or interests." The Secretary must then determine that transfer is in the national security interest of the United States. 2014 NDAA § 1035(b). This is by contrast to what the commander has always done before: determine in his discretion that a prisoner of war's *detention* no longer serves a sufficient purpose in the war.

Congress's intrusion does not end with "determinations." Congress lists *eight factors* the Secretary must "specifically evaluate" in making these determinations. Five meddle specifically in the President's foreign affairs function:

> (2) The security situation in the transferee country, "including whether or not the country is a state sponsor of terrorism;"
>
> (3) Even a single confirmed case of recidivism — which can include any "hostile" activity [whatever that means] — in the transferee country;
>
> (4) Any actions taken by the transferee country to reduce the risk of "reengagement" in terrorist activity;[8]
>
> (5) Any assurances that the transferee country controls detention facilities and that the transferee country "has taken or agreed to take actions to substantially mitigate the risk of the individual engaging or reengaging in any terrorist or other

---

[8]     This requirement applies even in the case of detainees like Ajam who never engaged in terrorism in the first place.

PROTECTED INFORMATION REDACTED

> hostile activity that threatens the United States or United States persons or interests;" and
>
> (6) An assessment of the transferee country's "track record" in meeting assurances "regarding its capacity and willingness to mitigate the risk of reengagement."

2014 NDAA § 1035(c).    Factor 5, in particular, compels the Executive to negotiate with the transferee country concerning "assurances," whether or not the Executive thinks that is wise diplomacy.

The meddling does not end with specific "determinations" and an assignment of "factors." The Commander-in-Chief's cabinet officer is then directed to write Congress a report that must lay out his written evaluation of each of the specified determinations under subsection (b), and each of the specified factors that back them under subsection (c). He must supply the report to eight committees of Congress at least 30 days before a prospective transfer. 2014 NDAA § 1035(d).

During those 30 days the news regarding the detainee's release may leak to the outside world. Those 30 days of confinement in Guantanamo would extend imprisonment beyond the commander's judgment of military necessity, and beyond resettlement logistics. Ajam would be a prisoner of Congress.

**E.    Presidential Acknowledgement of Section 1035's Unconstitutional Interference with Exercise of Executive Authority**

In signing the 2014 NDAA, the President described Section 1035's restrictions as fundamentally unwarranted, observing that "Section 1035 . . . in certain circumstances, would violate constitutional separation of powers

PROTECTED INFORMATION REDACTED

principles." Statement by the President on H.R. 3304 (Dec. 26, 2013), *available at* http://www.whitehouse.gov/the-press-office/2013/12/26/statement-president-hr-3304 ("2014 Signing Statement"). The President earlier expressed the same view as to the 2013 NDAA:

> [t]his provision hinders the Executive's ability to carry out its military, national security, and foreign relations activities and would, under certain circumstances, violate separation of powers principles.

Statement by the the President on H.R. 4310 (Jan. 3, 2013), *available at* http://www.whitehouse.gov/the-press-office/2013/01/03/statement-president-hr-4310 ("2013 Signing Statement"). He said much the same about the 2012 version of the law:

> Section 1035 modifies but fundamentally maintains unwarranted restrictions on the executive branch's authority to transfer detainees to a foreign country. This hinders the executive's ability to carry out its military, national security, and foreign relations activities and ... would, under certain circumstances, violate constitutional separation of powers principles. The executive branch must have the flexibility to act swiftly in conducting negotiations with foreign countries regarding the circumstances of detainee transfers. In the event that the statutory restrictions in section[ ] ... 1035 operate in a manner that violates constitutional separation of powers principles, my Administration will interpret them to avoid the constitutional conflict.

PROTECTED INFORMATION REDACTED

Barack Obama, Statement by the President on H.R. 1540 (Dec. 31, 2011), *available at* http://www.whitehouse.gov/the-press-office/2011/12/31/statement-president-hr-1540 ("2012 Signing Statement").

**F.     Impact of NDAA**

The impact of annual NDAA legislation has been dramatic. Prior to 2009, the Commander-in-Chief determined to cease targeting at least 459 men detained at Guantanamo Bay. *The Guantanamo Docket*, N.Y. Times, http://projects.nytimes.com/guantanamo/timeline (last visited June 18, 2014) ("Guantanamo Docket"). They were released and repatriated or settled in third countries without interference from Congress. *Id.* In 2009 and 2010, despite Congressional interference, releases continued, based on the Commander's case-by-case exercise of command authority. However, in 2011, releases and transfers crashed to a halt. Between January 7, 2011, when certification requirements were introduced, and July 26, 2013, not a single prisoner was transferred, except — remarkably — those prisoners convicted of war crimes (who had served their sentences), and Uighur prisoners transferred following grants by the district court of habeas relief. *Id.* In 2011, more men died at Guantanamo than were released. *Id.*

In 2013, the President noted that the certification requirements (analogous to the 2014 NDAA's "determination" requirements) "significantly limit[ed] [his] ability to transfer detainees out of Guantanamo, even those who have been approved for transfer." Statement by the Press Secretary on Guantanamo Bay (July 26, 2013), *available at* http://www.whitehouse.gov/the-press-office/2013/07/26/statement-press-secretary-guantanamo-bay ("July 26, 2013 White House Statement"). ■

**PROTECTED INFORMATION REDACTED**



Most recently, the Commander-in-Chief arranged a prisoner-of-war exchange to free Army Sgt. Bowe Bergdahl, a captive of Taliban forces. Such POW exchanges have been a common feature of previous wars[2], and are a key tool in the Commander's arsenal for prosecuting the war. Claudette Roulo, *Prisoner Swap Part of Long Tradition*, *DOD Counsel Says*, American Forces Press Service (June 11, 2014), *available at* http://www.defense.gov/news/newsarticle.aspx?id=122456.                The

---

[2] Throughout the history of the republic, prisoner of war exchanges have been a feature of the Commander-in-Chief's war powers. Exchanges and other releases of prisoners were made during the War of 1812, the Mexican-American War, the Civil War, World War I, World War II, the Korean War, and the Vietnam War. *See* Cong. Research Serv., *Prisoners of War: Repatriation or Internment in Wartime - American and Allied Experience*, 1775 to Present (1971); Major Gary D. Brown, PRISONER OF WAR PAROLE: ANCIENT CONCEPT, MODERN UTILITY, 156 Mil. L. Rev. 200, 214 (June, 1998). The Commander-in-Chief and the military have engaged in such exchanges with non-state actors, including the Barbary Pirates, the Viet Cong, and the Confederacy. *See* Kurt Eichenwald, *The Truth Behind the Bowe Bergdahl POW Prisoner Swap*, Newsweek, June 3, 2014; James P. Sterba, *First Prisoner Release Completed*, N. Y. Times, Feb. 13, 1972; James M. McPherson, BATTLE CRY OF FREEDOM 791 (1988).

**PROTECTED INFORMATION REDACTED**

Commander-in-Chief determined that compliance with the advance notice requirement would place Sgt. Bergdahl at risk. *See* Statement on the Transfer of Detainees before the House Armed Services Committee, Secretary of Defense Chuck Hagel, *available at* http://www.defense.gov/speeches/speech.aspx?speechid=1860, and proceeded without advance notice. *Id.* This historically-standard exercise of Commander-in-Chief authority led to sharp criticism in Congress, *see, e.g., Lawmakers: Obama releasing Taliban detainees with no notice first step in closing Guantanamo*, FoxNews.com (June 7, 2014), http://www.foxnews.com/politics/2014/06/07/lawmakers-obama-releasing-taliban-detainees-with-no-notice-first-step-in/ ("June 7, 2014 Fox News Article"), demonstrating Congress's misapprehension that it may intrude into the Commander's de-targeting decisions.

The 2011 NDAA instantly stopped Ajam's release process. J.A. 32 (Marshall Decl. at ¶ 6), and the 2012, 2013, and 2014 versions have continued to impede that process; absent relief, they will continue to do so. Ajam remains in prison today.

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*. *United States v. Salahmand*, 651 F.3d 21, 25 (D.C. Cir. 2011). There is no dispute concerning the material facts, and this appeal presents pure questions of law.

## SUMMARY OF ARGUMENT

I. The district court erred in holding that Appellant lacked standing to seek declaratory relief challenging the constitutionality of the NDAA's obstruction of the Commander-in-Chief's targeting decisions and

PROTECTED INFORMATION REDACTED

the President's authority with respect to foreign affairs. Because the NDAA also burdens the release process for Guantanamo prisoners like Appellant, it imposes upon Appellant a cognizable personal injury, fairly traceable to the statute itself, and redressable by a declaratory judgment.

II.    Section 1035 of the 2014 NDAA should be declared void as an unconstitutional violation of Article II, section 2 of the Constitution, which makes the Executive Branch the sole branch of government with authority to determine the timing and details of decisions to target, or not to target, persons falling within the class of enemy belligerents against whom military force may be used under a Congressional force authorization. Section 1035 also infringes on the Executive's foreign affairs authority over questions of the resettlement or transfer of alleged enemy aliens outside the borders of the United States.

III.    The district court erred in holding that section 1035 of the 2014 NDAA is not void as an unconstitutional bill of attainder. It is an act of the legislature to punish Ajam and other Guantanamo prisoners, because it acts to prolong imprisonment from the period when it might have constituted, under the laws of war, non-punitive detention, *see Ali v. Obama*, 736 F. 3d 542, 545 (D.C. Cir. 2013), to a period during which by definition and by express Congressional intent, detention becomes imprisonment, with punitive intent and effect.

PROTECTED INFORMATION REDACTED

## ARGUMENT

I.    **The District Court Erred as a Matter of Law in Holding Appellant Lacked Standing to Seek Declaratory Relief.**

Below, the Court rested its decision with respect to the Article II powers issue entirely on standing,[10] ruling incorrectly that Ajam lacks a sufficient "legal interest" in the controversy.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies'." *Susan B. Anthony List v. Driehaus*, No. 13–193, 2014 WL 2675871, *5 (U.S. June 16, 2014). Courts require that a litigant "allege[] such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (internal quotation marks omitted). This case presents none of the usual "speculative injury" problems – for example, that persons or organizations might be spied upon, which the Supreme Court held was not a sufficiently concrete injury, *see Clapper v. Amnesty Int'l*, 133 S. Ct. 1138 (2013), or that members of an environmental group might visit national forests allegedly compromised by lax regulations. *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009). Ajam's injury is personal, and is felt personally each day.

---

[10] The district court did, however, reach the merits of the bill of attainder issue.

**PROTECTED INFORMATION REDACTED**

### 1.    The Law-of-War Context of the Standing Dispute.

The imposition of military force against a specific person like Ajam involves two kinds of government power. First, the government must make Ajam targetable: *i.e.,* identify a class of persons, of which he is a member, against whom military force may lawfully be used. The coordinate branches play crucial roles in this regard. Only Congress, by authorizing war and naming the enemy, can establish the broad definition of the targetable class. U.S. Const. Art. I section 8. Its war declaration makes members of the military arm of the enemy targetable by the Commander-in-Chief with military force. Military force includes lethal force, and also the kind of force at issue here: detention of the alleged enemy belligerent during active hostilities. *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004). The judicial branch also has a crucial role: it can hear a prisoner's challenge that he is not within that targetable class. *Boumediene v. Bush*, 553 U.S. 723, 792 (2008).

This appeal involves something different. For actual use of military force against a particular person within the targetable class involves a second government power, this one unique to the President in his capacity as Commander-in-Chief. The Commander-in-Chief need not, and does not use military force against *every* permissible target; he picks and chooses according to his strategic management of the war. Only he can decide, as a matter of his discretion as Commander-in-Chief, whether to target with military force a particular targetable alien. U.S. Const. Art. II, § 2. And only the Commander-in-Chief can decide which targetable aliens should no longer be targeted. *See* discussion*, infra* at pp. 32-37.

PROTECTED INFORMATION REDACTED

2.     **The District Court's Standing Analysis Was Erroneous.**

The decision below arises in this law-of-war context. It proceeds from the faulty premise that Ajam raised a challenge to the first exercise of governmental power — whether he was targetable in the first place, rather than the second — whether he should be targeted. The court framed Ajam's argument in this way:

> Mr. Ahjam asserts that his "constitutional right to be free," Pet's Mot. Summ. J. 24, is a legally protected interest sufficient to support his standing to challenge the NDAA certification provisions.

J.A. 53. The court noted that the President had made a discretionary decision to transfer Ajam, which gave Ajam no unfettered "right to be free." *Id.* at 54-55. It concluded that "[t]he failure to establish a legally protected interest forecloses each of Mr. Ahjam's injury-in-fact arguments." *Id.* at 56.

The district court erred in two ways: (i) by holding that Ajam failed to show a "legally protected interest," *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and (ii) by misconstruing the nature of the legal right that Ajam claims.

(i)     *Legally-protected Interest.* Senior Circuit Judge Williams has admonished that "users of the "legally protected" tag should proceed with caution." *See Judicial Watch, Inc. v. United States Senate*, 432 F. 3d 359, 363-66 (D.C. Cir. 2005) (Williams, J., concurring). Judge Williams noted that the puzzling formulation, "legally protected interest," was ambiguous and circular as a standing concept, because whether plaintiff's interest is "legally protected" is, of course, the ultimate *merits* question in a suit. The

20

**PROTECTED INFORMATION REDACTED**

*standing* issue is simply whether his interest is concrete and personal, and the injury both causally related and remediable by decree, so that a federal court may decide whether that interest is indeed "legally protected." Noting that *Lujan,* which coined the phrase, "did not purport to announce a new rule," but simply restated a three-part test that never previously inquired into the legal merits of the plaintiff's case, Judge Williams deduced that the Supreme Court's use of the "legally protected" phrase likely was intended to mean, "judicially cognizable": that is, the sort of dispute whose merit it is appropriate for a federal court to decide. As he noted, the Supreme Court has used the two phrases interchangeably. *Judicial Watch*, 432 F.3d at 363-364.

In recent opinions, the Supreme Court has moved away from the "legally protected" formulation, in favor of the more apt phrase, "judicially cognizable." After Judge Williams' concurrence was published, only three standing decisions include the "legally protected" phrase at all, and in each, only in a block quote from *Lujan*.[11] Fourteen opinions exclude the "legally protected" language from their own articulation of the test.[12] Most recently,

---

[11]    *See United States v. Windsor*, 133 S. Ct. 2675 (2013); *Arizona Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436 (2011); *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269 (2008).

[12]    *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014); *Already, LLC v. Nike, Inc.,* 133 S. Ct. 721 (2013); *Clapper,* 133 S. Ct. 1138; *Bond v. United States*, 131 S. Ct. 2355 (2011); *Camreta v. Greene*, 131 S. Ct. 2020 (2011); *Horne v. Flores,* 557 U.S. 433 (2009); *Summers v. Earth Island Inst.,* 555 U.S. 488 (2009); *Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008); *Plains Commerce Bank v. Long Family Land & Cattle Co.,* 554 U.S. 316 (2008); *Hein v. Freedom From Religion Found.,*

PROTECTED INFORMATION REDACTED

in *Driehaus,* the Supreme Court endorsed this view unanimously.  It cited *Lujan* as authority for the standard test: concrete harm, causation, and redressability, without quoting the phrase, "legally protected interest." *Driehaus,* 2014 WL 2675871 at *5. "The doctrine of standing "identif[ies] those disputes which are appropriately resolved through the judicial process," the Court noted. *Id.* (quoting *Lujan,* 504 U. S. at 560).

Judge Williams' admonition has also been cited and followed in the lower courts.  *Parker v. District of Columbia,* 478 F.3d 370, 377-78 (D.C. Cir. 2007) (citing concurrence to reinforce that "legally protected interest" standard must not be taken to refer to the merits), *aff'd sub nom. District of Columbia v. Heller,* 554 U.S. 570 (2008); *The Wilderness Soc'y v. Kane Cnty., Utah,* 581 F.3d 1198, 1211 (10th Cir. 2009), *on reh'g en banc sub nom. The Wilderness Soc. v. Kane Cnty., Utah,* 632 F.3d 1162 (10th Cir. 2011) ("The Supreme Court has used ["legally protected" and "judicially cognizable"] interchangeably since "legally protected" was introduced in *Lujan*.); *Disability Rights Council of Greater Washington v. Washington Metro. Area Transit Auth.,* 239 F.R.D. 9, 16-17 (D.D.C. 2006) (The phrase, "legally protected … is both puzzling and potentially misleading" and "has been used inconsistently by the Supreme Court since its appearance in *Lujan*.").

(ii)     *The Claimed Right.*  The district court misconstrued the nature of the right claimed by Ajam in any event.  His point below was not that the

---

*Inc.,* 551 U.S. 587 (2007); *Lance v. Coffman,* 549 U.S. 437 (2007); *Massachusetts v. E.P.A.,* 549 U.S. 497 (2007); *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007); *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332 (2006).

**PROTECTED INFORMATION REDACTED**

President's Task Force had conferred upon him a generalized "right to be free."[13] The argument was narrower: if one accepts, *arguendo*, that he is a detainable alien, he still has the right to be free from targeting with military force or punishment by any part of our government, *once the Commander-in-Chief determines that he should not be targeted*. The President has made that determination here. There are practical impediments to transfer, because it requires the involvement of a foreign government, but while Ajam's transfer or release will inevitably be delayed by practical considerations, he has the right to complain that the President's actions in causing his transfer or release are hobbled by a coordinate branch of the government exceeding its constitutional remit.

### 3.    Appellant Meets the Standing Test.

The general context laid out above informs the particular test for Constitutional standing, which requires that the litigant show that he suffers (1) a concrete, particularized, and actual or imminent injury; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling. *Driehaus*, 2014 WL 2675871 at *5; *Clapper*, 133 S. Ct. at 1141.

---

[13]    The district court lifted the "right to be free" phrase from context. Ajam wrote below that he "suffers at least two concrete injuries from the certification barrier raised by Section 1028 of the NDAA, each of which must be considered in the context of *Ajam's constitutional right to be free from unlawful imprisonment*, see Boumediene, 553 U.S. at 771; Pet.'s Mot. For Partial Summ. J. 24-25 (emphasis added).

PROTECTED INFORMATION REDACTED

    a.    **Ajam suffers and has suffered Concrete, Actual Injury.**

Petitioner suffers at least two concrete injuries from the certification barrier raised by Section 1035 of the NDAA. *First*, as applied to a prisoner like Ajam who has been cleared by the President's Task Force, the statute on its face causes a concrete harm. By limiting the President's ability to desist from targeting a cleared prisoner, Section 1035 necessarily limits the prisoner's opportunity to be released. *Second*, the record of this case shows that the enactment of Section 1035's predecessor ███████████████

██████████████████████████████████████

███████

Many cases establish that "loss of chance" through, for example, impairment of a process, is an injury-in-fact sufficient for standing. For example, in *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1103 (D.C. Cir. 2005), a prisoner challenged parole hearing procedures that foreclosed legal representation. The procedures did not foreclose parole, and plaintiff could never have demonstrated that different procedures would have led, in his case, to a different outcome. It was enough that the process change made his objective more difficult to obtain. Congress's intrusion here is just the same. So, too, in *United States v. Lopez*, 650 F.3d 952, 960 n.7 (3d Cir. 2011), where prisoners complained that downward departures in their sentencing ranges were unavailable in the districts where they were prosecuted. The court held that the prisoners had standing to challenge the Department of Justice's failure to implement similar procedures in their districts, without any showing that those procedures would result in shorter sentences in their cases. Procedural impairment was a concrete injury.

**PROTECTED INFORMATION REDACTED**

In *Settles,* this Court analogized to equal protection cases where the government erects barriers that arguably make it more difficult for a person to obtain a benefit. 429 F. 3d at 1102. For example, in *Northeast Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,* 508 U.S. 656, 665 (1993), the Supreme Court held that contractors had standing to challenge an ordinance that gave preferential treatment to minority-owned businesses. They were not obliged to show that they would have been awarded contracts without the ordinance. In *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211 (1995), the Court reaffirmed this principle, noting that "Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract." In *Gratz v. Bollinger,* 539 U.S. 244, 261-62 (2003), the Supreme Court held that plaintiffs had standing to challenge affirmative action policies because the policies impaired the process by which they might compete for admission. Similarly, the dilution of a person's constitutional right to vote produced a cognizable injury, without any showing that, absent the dilution, election outcomes would differ. *Baker v. Carr,* 369 U.S. 186, 208 (1962).

Procedural impairment of the Commander-in-Chief's de-targeting efforts impairs the process by which this Appellant can leave Guantanamo. That is an actual harm, as concrete as any felt in the cited cases.

That injury is sharpened by its constitutional context. As a prisoner in executive detention, Appellant enjoys the privilege of *habeas corpus, Boumediene,* 553 U.S. at 771, that is, the right to be released unless the President points to a legal justification for his detention. *Id.* The President had previously pointed to Ajam's (contested) status as an enemy belligerent,

**PROTECTED INFORMATION REDACTED**

but once the President decided to desist from targeting Ajam with military force, the existence of a Congressional limitation, like Section 1035, on the release *process* is a concrete injury, felt presently and particularly by Ajam, as a cleared detainee. *See Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009) (explaining that *any* restriction on detainee transfers makes it more difficult for the President to arrange safe transfers for detainees and thus ultimately release the detainees); July 26, 2013 White House Statement (explaining that certification requirements significantly limit the President's ability to transfer detainees, even for detainees cleared for release).

Ajam's particular grievance is not merely the loss of the opportunity of release; his facts show that Congressional intrusion ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████

That Petitioner is not a member the Executive Branch does not bar him from challenging an unconstitutional invasion of its prerogatives. *INS v. Chadha*, 462 U.S. 919 (1983) (holding that immigrant has standing to challenge an unconstitutional invasion of presidential powers by Congress when that invasion caused him direct harm). The Court rejected the "contention that Chadha lacks standing because a consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests." *Id.* at 935-36. Like Chadha, Ajam can demonstrate "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Id.* at 936; *see also Boumediene*, 553 U.S. at

**PROTECTED INFORMATION REDACTED**

743 ("Because the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles.") (internal citations omitted).

### b.    Appellant's Injuries Have Been Directly Traceable to the Requirements of the NDAA.

The injury need not flow exclusively or even directly from the challenged action. *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001). All that is required is that the challenged conduct plays a substantial role in the resulting injury. *Id.* The injury here is diminished opportunity for transfer. Causation is self-evident. Section 1035 of the 2014 NDAA, and nothing else, imposes limits on transfers. This is undisputable on the face of the statute; it is the *purpose* of the statute. The injury Appellant complains of is directly traceable to Section 1035 of the 2014 NDAA.

███████████████████████████████████████████████████████

███████ ███████ █████ █████ ███ ██ █████ ███████

████████████████████████████████████████ Since the enactment of the NDAA, transfers have devolved to those who win habeas petitions, and, most ironically, to prisoners convicted of war crimes. *See Guantanamo Docket* (tracking prisoner transfers and deaths). In 2011, more prisoners died than were released. *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**PROTECTED INFORMATION REDACTED**



**PROTECTED INFORMATION REDACTED**

Contribution to an injury will suffice for causation purposes. In *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74-78 (1978), the Supreme Court held that plaintiffs had standing to challenge the Price-Anderson Act on the grounds that the statute, by limiting liability for nuclear plants, contributed to plaintiffs' environmental injuries. In *Tozzi*, this Court held that a PVC manufacturer had standing to contest an agency's listing of dioxin as a carcinogen, even though other factors may have contributed to a decline in sales of its products. 271 F.3d at 309. The classification as a carcinogen was at least a "substantial factor" in the decisions of state and local agencies to regulate dioxin or of healthcare companies to reduce or end purchases of PVC plastics. *Id.*

**c.    A Declaration that Section 1035 is Void Would Redress Appellant's Injuries.**

The third prong of the standing inquiry requires that there be a "substantial probability" that the relief requested will redress the injury claimed. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977). Appellant need not negate "speculative and hypothetical

**PROTECTED INFORMATION REDACTED**

possibilities" to demonstrate the likely effectiveness of judicial relief. *Duke Power Co.*, 438 U.S. at 78. Because section 1035 of the NDAA necessarily harms any prisoner cleared for transfer, voiding it in a declaratory judgment will redress the harm.

Even if the "injury" had narrowly to be construed as actual detention, as opposed to the loss of opportunities for release, Appellant's continued detention would be redressable by voiding Section 1035 of the NDAA. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Voiding Section 1035 of the 2014 NDAA as to cleared prisoners would relieve the Executive of the impediment upon its decision to desist from targeting, unhampered by congressional constraints.

The Supreme Court has found redressability where a chain of events was far less concrete. In *Arlington Heights*, a developer challenged the denial of a rezoning request because the denial had discriminatory effects. 429 U.S. at 260. The Supreme Court ruled that an injunction compelling the rezoning would redress the developer's injury, even though the injunction could not guarantee that the housing complex would be built. *Id.* at 261. So, too, the procuring of a third country to accept Ajam is not "undue speculation," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Like the developers in *Arlington Heights*, Ajam has standing even though there are other barriers to his eventual release.

**PROTECTED INFORMATION REDACTED**

4.     **The Special Circumstances of this Case Give Ajam Standing.**

   a.     **Ajam has Standing in Habeas.**

Ajam is a habeas petitioner. A prisoner challenging a statute written uniquely for his particular prison, that expressly limits the means by which he might be released, is not speculating. He attacks legislation that targets him, with the intent and effect of limiting his own freedom. It is difficult to imagine a litigant more squarely and personally situated to raise a concrete "case or controversy." "Habeas corpus cuts through all forms and goes to the very tissue of the structure." *Frank v. Mangum*, 237 U.S. 309, 346 (1915) (Holmes, J., dissenting). Habeas is a remedy against any restraint on liberty, including prolonging of imprisonment. *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973). For example, a prisoner released on parole from immediate physical confinement is nonetheless sufficiently restrained in his freedom as to be in custody for purposes of federal habeas corpus. *Jones v. Cunningham*, 371 U.S. 236 (1963). In *Hensley v. Municipal Court*, 411 U.S. 345 (1973), the court held that a person who, after conviction, is released on bail or on his own recognizance, is "in custody" within the meaning of the federal habeas corpus statute. The alien cases — *Brownell v. Tom We Shung*, 352 U.S. 180, 352 U.S. 183 (1956); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950); *United States v. Jung Ah Lung*, 124 U.S. 621, 124 U.S. 626 (1888) — show that the habeas petitioner has standing to attack anything that may tend to preclude his liberty, including in cases concerning whether an alien, who is otherwise without rights, may enter the country. Here the statute prolongs imprisonment by complicating the

PROTECTED INFORMATION REDACTED

President's task, imposing a political "cost" to release in the form of the required determinations and the thirty-day notice.   That is enough for standing in *habeas.*

### b.    The  Court  Should  Presume  Ajam  has  Standing Because     He is the Object of Government Action.

When a party is the direct object of a law or regulation, courts have little difficulty finding standing.    *Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176 (D.D.C. 2008) ("Plaintiffs are typically presumed to have constitutional standing when, as here, they are directly regulated by a rule.").  The "direct object" proposition applies, as well, where a party is the indirect but necessary object of a law. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 734 (D.C. Cir. 2003).  A conservation group challenged the Secretary of the Interior's placement of Mongolia's argali sheep on the "threatened species" list.  Mongolia sought to intervene, contending that Mongolia was the indirect but necessary object of the regulation, because hunting-related tourism would be affected by the secretary's action.  This Court permitted intervention (overruling a denial below), reasoning that Mongolia is necessarily an object of regulations that will impact its tourism industry.  The regulation did not directly address the state, just as the NDAA applies more directly to the President, but Mongolia was a necessary object of the regulation, just as, here, Guantanamo detainees are necessarily objects of section 1035 of the 2014 NDAA.

32

**PROTECTED INFORMATION REDACTED**

II.    **The Court Should Direct the District Court to Grant Appellant's Request for Declaratory Relief**

    1.    **This Court Should Review Appellant's Constitutional Challenge.**

Ajam's merits challenge was briefed below.[14] It presents a pure issue of Constitutional law and requires no fact-finding. Acute as it is, the problem evades review, because the statute is amended each year. During the briefing below, the 2014 NDAA supplanted the 2013 NDAA. The matter arises in connection with a request for relief — *habeas* — that should be urgent. *See Boumediene*, 553 U.S. at 783. As the recent political uproar concerning the Commander-in-Chief's POW exchange to protect Sgt. Bergdahl shows, the legal question is one of considerable public importance. And while this Court will not issue advisory opinions, its decision resolving the concrete dispute presented by Ajam's case will provide useful and timely guidance to the lower courts, the public, and other branches of government.

    2.    **The President's Exclusive Commander-in-Chief Power Precludes Congress From Interfering with Targeting Decisions Within the Scope of Authorized Armed Conflict.**

Article I, Section 8 of the Constitution gives Congress the exclusive power to declare war. But under Article II, Section 2, the President is granted the exclusive power to carry out that war: he "shall be Commander in Chief of the Army and Navy of the United States . . . ." As Commander-in-Chief, the President has the power to direct, against specific lawful targets, the "military force" that Congress has generally authorized him to

---

[14]    The government had an opportunity to brief the point but declined to do so.

33

PROTECTED INFORMATION REDACTED

use: that is, against lawful objects of military force within the scope of the congressional authorization.

"Military force" may take various forms.  Lethal force is one, detention of the enemy belligerent another.  As the Supreme Court noted in *Hamdi,* detention of individuals who fought against the United States in Afghanistan "for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war *as to be an exercise of the 'necessary and appropriate force' Congress has authorized the President to use,*" 542 U.S. at 518 (emphasis added); *see Boumediene,* 553 U.S. at 733 (reaffirming that detention is a form of force the President is authorized to use as part of his war powers).  Because Ajam has never been charged with any crime, his detention was a discrete targeting decision of the Commander-in-Chief, justified by nothing more than the President's power under the AUMF to target those allegedly within the scope of the war authorization.

Congress may not "interfere[ ] with the command of the forces and the conduct of campaigns.  That power and duty belong to the President as commander-in-chief." *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866); *see Hamdan v. Rumsfeld*, 548 U.S. 557, 592 (2006) ("Congress cannot direct the conduct of campaigns.") (quoting *Ex Parte Milligan*, 71 U.S. (4. Wall.) at 149); *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850) ("As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual . . . .").  The word itself – "commander" – denotes a power that by definition must be unique to

**PROTECTED INFORMATION REDACTED**

one person. "[T]here is an inviolate, preclusive core to the [Commander-in-Chief] clause." David J. Barron & Martin S. Lederman, *The Commander In Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding*, 121 HARV. L. REV. 689, 800 (2008). As Alexander Hamilton observed in the Federalist Papers, "[o]f all the cares or concerns of government, the direction of war most peculiarly demands those qualities which distinguish the exercise of power by a single hand." The Federalist No. 74, at 446 (Alexander Hamilton) (Clinton Rossiter ed., 2003).

The idea that Congress may not direct the conduct of military tactics is embodied in the Constitution, which provides Congress only with the power to "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, §8, cl. 14.; *see* Harvard Law Review, *Recent Legislation*, 127 Harv. L. Rev. 835, 838 (2013). The Articles of Confederation, in contrast, gave Congress "the sole and exclusive right and power of . . . making rules for the government and regulation of . . . land and naval forces, and *directing their operations*." Articles of Confederation of 1781, art. IX, para. 4 (emphasis added). This discrepancy shows that the drafters of the Constitution intended to remove the direction of military operations from the control of Congress.

From the proposition that only the President can decide which lawful target within the broad scope of a congressional authorization to direct actual military force should actually be targeted, it follows that only the President can determine whether and when to *desist* from directing military force against a specific target. For example, the tactical decision whether to retreat from a hill, like the decision whether to attack it in the first place,

PROTECTED INFORMATION REDACTED

must be for the President, or his delegated agents, alone. Desisting from the detention of Ajam is like retreating from the hill. Transfer or release of a targetable enemy belligerent reflects tactical judgment uniquely for the Commander-in-Chief, and subject entirely to his risk-benefit analysis as commanding general. The tactical costs the Commander may suffer from continuing an otherwise lawful detention include the costs of maintenance (food, shelter, deployment of security forces), and the inspirational effect of continued detention on actual and potential enemy belligerents in the field. It is for the Commander alone to determine whether release presents the best tactic for advancing the nation's interests in an authorized conflict. Just as it may not demand "determinations" before the President orders a retreat from the hill, Congress may not with determinations burden his sole discretion to desist from other targeting decisions – such as the transfer of Ajam.

The requirements in Section 1035 of the 2014 NDAA, at least to the extent they apply to transfers of detainees for release *outside* the territory of the United States, constitute a profound intrusion into the President's authority as Commander-in-Chief. Interference with a tactical decision, on a target-by-target basis, directly intrudes on his exclusive prerogative under Article II, Section 2, to make tactical decisions concerning the deployment of force during an authorized armed conflict.

Many of the requirements address the risk presented by release of the detainee. *See* 2014 NDAA § 1035(c)(5)(A) (assurances that the transferee state maintains control over the detention facility); *id.* § 1035(c)(5)(B) (assurances that the transferee state has taken actions to "substantially mitigate the risk of the individual engaging or reengaging in any terrorist or

PROTECTED INFORMATION REDACTED

other hostile activity that threatens the United States or United States persons or interests"); *id.* § 1035(c)(2) (the security of the transferee state, including "whether or not the country is a state sponsor of terrorism, the presence of foreign terrorist groups, and the threat posed by such groups to the United States"). Yet in making a risk assessment that only he can make, the Commander-in-Chief may deem it prudent and necessary to exchange one risk for another. As he was obliged to do to protect a U.S. serviceman, the President may release a detainee to procure an exchange of U.S. forces held by the enemy. He may determine that the continued detention of the enemy belligerent provokes and inspires other persons to provide aid and comfort to the enemy and to endanger U.S. forces or interests, or that the financial or moral burden of detention outweighs its benefit—or for any other reason that informs his tactical judgment.[15] Congress has no power to second-guess or burden these judgments.

Thus, as applied to a person held during active hostilities in an authorized war *only* on the President's assertion that he is an enemy belligerent, Section 1035 of the 2014 NDAA is an unconstitutional intrusion into the Commander-in-Chief's sole authority to cease directing military

---

[15] Indeed, the President has expressed concern that Guantanamo "weakens our national security by wasting resources, damaging our relationships with key allies, and strengthening our enemies." 2013 Signing Statement; *see also* Press Briefing by White House Press Secretary Jay Carney (May 1, 2013), http://www.whitehouse.gov/the-press-office/2013/05/01/press-briefing-press-secretary-jay-carney-512013 (emphasizing the President's determination to close the Guantanamo Bay detention facility because it is "a recruitment tool for extremists" that "hurts our ability to cooperate with other nations and their agencies of government").

PROTECTED INFORMATION REDACTED

force against that person.   Any prerequisite imposed by Congress as a precondition to the Commander-in-Chief's cessation of military force against a particular, targetable person infringes on his authority to make tactical decisions, in real time, and on how best to use the force that he is authorized by the AUMF to use.[16]

> **3.    The President's Power Under the Foreign Affairs Clause Precludes Congress' Interference with Executive Agreements and Sensitive Diplomatic Negotiations.**

The President is the "sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (noting that the President's "plenary and exclusive" foreign affairs power, grounded in the Constitution, requires Congress to "accord to the President a degree of discretion and freedom from statutory restriction," especially during wartime); *see Earth Island Inst. v. Christopher*, 6 F.3d 648, 652-53 (9th Cir. 1993) (statute directing Secretary of State to initiate negotiations with foreign countries to develop treaties to protect sea turtles violated the separation of powers).

The Supreme Court has consistently "recognized 'the generally accepted view that foreign policy [is] the province and responsibility of the Executive.'" *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)).  This foreign affairs power is exclusive: it is "the very delicate, plenary and exclusive power of the President as sole organ of the federal government in the field of international

---

[16] Ajam does not assert that a constitutional problem would arise from a requirement that the President notify Congress, after the fact, of what actions the President has taken.

**PROTECTED INFORMATION REDACTED**

relations – a power which does not require as a basis for its exercise an act of Congress." *See Curtiss-Wright*, 299 U.S. at 320; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 812 n.19 (1982) (conducting foreign affairs and protecting the national security are "'central' Presidential domains") (internal citation omitted); *Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982) (emphasizing President's constitutionally superior position in conducting foreign affairs); *Zivotofsky ex rel. Zivotofsky v. Sec'y of State*, 725 F.3d 197, 214-220 (D.C. Cir. 2013) (holding that the President has the exclusive power to recognize foreign governments, because that power includes formulating policy toward foreign governments). "[T]he Founders in their wisdom made [the President] not only the Commander-in-Chief but also the guiding organ in the conduct of our foreign affairs. He who was entrusted with such vast powers in relation to the outside world was also entrusted by Congress, almost throughout the whole life of the nation, with the disposition of alien enemies during a state of war." *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948).

Included within the President's foreign affairs power is his "authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003). The Supreme Court carefully distinguished "the competence of the President" to enter into executive agreements incident to conduct of diplomatic relations without congressional interference, from the shared treaty power which requires the advice and consent of the Senate. *United States v. Belmont*, 301 U.S. 324, 330 (1937).

PROTECTED INFORMATION REDACTED

Last year, in *Zivotofsky v. Sec'y of State*, 725 F.3d 197 (D.C. Cir. 2013), this Court reviewed a case involving Congress' interference with the Executive's power to recognize foreign governments. The Court voided a statute requiring that the Secretary of State mark passports to show "Israel" as the place of birth for those born in Jerusalem, explaining that even though Congress has the power to regulate passports, it may not infringe on Executive authority. *Id.* at 220. The Executive argued that requiring the Secretary of State to issue passports passing on the status of Jerusalem would complicate "a highly sensitive, and potentially volatile, mix of political, juridical and religious considerations . . . ." *Id.* at 200. Because the national security or foreign policy of the United States was affected, deference to the Executive's core function as the "sole organ of the nation in its external relations" precluded any interference by Congress. *Id.* at 211 (quoting *Curtiss-Wright*, 299 U.S. at 319).

Section 1035 intrudes on this foreign affairs power in just the same way. Desisting from targeting Ajam requires his transfer to a foreign country. To effect this transfer, the President must engage in sensitive diplomatic negotiations with transferee countries (just as he did with Qatar, in connection with the recent transfer of detainees in exchange for Sgt. Bergdahl's release). The product is an executive agreement governing the terms of the transfer. *See* 2013 Signing Statement. By conditioning the substance of any agreement with a transferee nation, *see* NDAA § 1035(b), and addressing the nature and conduct of the transferee nation, *see id.* §§ 1035(c)(2)-(6), Congress intrudes upon the President's management of delicate foreign relations. *See Zivotofsky*, at 218-20.

**PROTECTED INFORMATION REDACTED**

Even the far less burdensome requirement that the government submit sealed notices to the Court before exercising unilateral power to transfer Guantanamo detainees was held to be an unconstitutional infringement of the President's foreign affairs power. *See Kiyemba v. Obama* (*Kiyemba II*), 561 F.3d 509, 515 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 1880 (2010) (mem.) (holding that the "requirement that the Government provide pre-transfer notice interferes with the Executive's ability to conduct the sensitive diplomatic negotiations required to arrange safe transfers for detainees"). The NDAA is far more intrusive; the President himself has acknowledged that the 2013 NDAA significantly impaired delicate foreign bargaining and relations between the United States and other nations. *See* 2013 Signing Statement; July 26, 2013 White House Statement (reiterating that the certification requirements "significantly limit[] [the President's] ability to transfer detainees out of Guantanamo, even those who have been approved for transfer").

Through its "determinations," Section 1035 continues the unconstitutional intrusion into the "plenary and exclusive" foreign affairs power accorded to the President. *Curtiss-Wright*, 299 U.S. at 320; *see Zivotofsky*, slip op. at 25. The determinations would dictate some terms of any agreement into which the President might enter to transfer detainees. This Court should rule section 1035 void, and direct the district court to enter appropriate declaratory relief.

PROTECTED INFORMATION REDACTED

III.    **The District Court Erred in Holding That Section 1035 is Not an Unconstitutional Bill of Attainder.**

Section 1035 should be struck as a bill of attainder, prohibited to Congress by Article I, Section 9. "[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Lovett*, 328 U.S. 303, 315 (1946). Section 1035 readily passes the first part of the test: it applies only to the easily ascertainable members of a particular group, the fewer than 150 men still detained at Guantanamo. It is also plain that it limits their release without judicial trial. The only question is whether it imposes punishment.

The district court held that military detention at Guantanamo is not punishment, citing *Ali v. Obama*, 736 F.3d at 545. But *Ali* decided only that the Commander-in-Chief's detention of a detainable alien through so much of active hostilities as he determines is necessary is not "punishment." This case is very different: it is about legislative *extension* of that detention after the Commander in Chief's determination that it is no longer necessary.

Such extensions are no part of the law of war. They *are* punishment: they represent nothing more than the Legislature's generalized wish to incarcerate a discrete and deeply unpopular cohort of offshore prisoners, because there is political advantage to be made from such punishment.

Bill of attainder jurisprudence has developed a functional test, which courts use when legislatures impose novel punishments on disfavored persons. *See Foretich v. United States,* 351 F.3d 1198, 1223 (D.C. Cir. 2003) (holding that a statute prohibiting a father from visitation with his

42

**PROTECTED INFORMATION REDACTED**

child violated the Bill of Attainder Clause under a functional test, even though prohibiting visitation is outside the historical definition of punishment). Here the punishment, imprisonment, could hardly be less novel, so the historic test suffices:

> Under the "historic" test, courts review the purported punishment and determine whether it imposes "punishment traditionally judged to be prohibited by the Bill of Attainder Clause." *Nixon* [*v. Admin. of Gen. Servs.*], 433 U.S. [425] at 475, 97 S.Ct. [2777] at 2806 [(1977)]. Traditional "impermissible" punishments include, among others, death sentences, *imprisonment*, banishment, and "a legislative enactment barring designated individuals or groups from participation in specified employments or vocations."

*McMullen v. United States*, 953 F.2d 761, 766 (2d Cir. 1992) (emphasis added). Thus Ajam's imprisonment must be punishment if it is not merely the incapacitation, as a military necessity, of an enemy belligerent—and, as noted above, the Commander has said there remains no military need to confine him.

Congress has made plain that its intention *is* punishment. For example, Senator Lindsey Graham said that his goal is "to *keep these prisoners in jail* when appropriate to protect the United States," while [President] Obama and fellow administration officials are "trying to clean out the jail." June 7, 2014 Fox News Article (emphasis added).

Section 1035 does not provide a general punishment for a class of *activity* into which Ajam's conduct falls. It makes no distinction between Ajam and those accused of crimes, or those who engaged in actual war-

43

PROTECTED INFORMATION REDACTED

fighting.  Section 1035 is premised not on any conduct by Ajam or on any finding as to him, but on the happenstance of his presence at a *particular* prison.

*Kiyemba v. Obama (Kiyemba III)*, 605 F.3d 1046 (D.C. Cir. 2010), rejected a bill of attainder challenge by Guantanamo detainees, but in a critically different context.  In *Kiyemba III*, Uighur detainees contended a law forbidding Guantanamo detainees from entering the United States was a bill of attainder.  (A similar provision is carried over in the 2014 NDAA, at Section 1034.)  This Court rejected the contention, under the proposition that the Uighurs had no right to enter the United States in the first place:

> Appellants also argue that the new statutes are unlawful bills of attainder.  The statutory restrictions, which apply to all Guantanamo detainees, are not legislative punishments; they deprive Appellants of no right they already possessed. *See Nixon* [433 U.S. at 475 (1977)].

*Kiyemba III*, 605 F.3d at 1048.  Ajam does not seek release in the United States.  He seeks an unfettered transfer process.

## CONCLUSION

Appellant requests that the Court reverse the district court's judgment dismissing his claim for declaratory judgment, and remand the case with directions that the district court enter an appropriate declaratory judgment declaring section 1035 of the 2014 NDAA to be void.

**PROTECTED INFORMATION REDACTED**

Dated:  July 8, 2014                    Respectfully Submitted,


  /s/ *David S. Marshall*

David S. Marshall
  *Counsel of Record*
1001 Fourth Avenue, 44th Floor
Seattle, WA 98154-1192
Telephone: (206) 826-1400
Facsimile: (206) 389-1708
dmarshall@DavidSMarshall.com


Sabin Willett (Bar No. 50134)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000
Sabin.willett@bingham.com

**PROTECTED INFORMATION REDACTED**

**Certificate of Compliance Under Fed. R. App. 32(a)(7)**

I, Sabin Willett, hereby certify that, based upon the word and line count of the word processing system used to prepare this brief, the brief contains 10,273 words.

                                       */s/ Sabin Willett*
                                        Sabin Willett (Bar No. 50134)

PROTECTED INFORMATION REDACTED

No. 09-745

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

AHMED ADNAN AJAM,

*Appellant,*

v.

BARACK OBAMA, ET AL.,

*Respondents-Appellees.*

## CERTIFICATE OF SERVICE

I certify that, on this 8th day of June, 2014, I served the foregoing Brief of Appellant on the Respondents' counsel of record by causing copies to be sent by Express Mail to Sonia McNeil, Attorney, Appellate Staff, Civil Division, Room 7234, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001.

/s/ *Douglas A. Hastings*
Douglas A. Hastings

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AHMED ADNAN AJAM (ISN 326), | NO.  14-5116 |
| Petitioner/Appellant, | |
| v. | CERTIFICATE OF SERVICE |
| RICHARD BUTLER, et al., | |
| Respondents/Appellees. | |

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2014, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated this 9th day of July, 2014.

Respectfully submitted,

Tracey L. McDonald
Legal Assistant to David S. Marshall
1001 Fourth Avenue, 44th Floor
Seattle, WA 98154-1192
Telephone: (206) 826-1400
Facsimile: (206) 389-1708